UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

MARIE MOHAN,

                     Plaintiff,

               v.

CITY OF NEW YORK, SEUNGHWAN KIM,
VINCENT RIVERA, and MICHAEL
AARONSON,

                 Defendants.

------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: August 3, 2018

17 Civ. 3820 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

       Plaintiff Marie Mohan importunes this Court for relief against the City of

New York (the "City"), Seunghwan Kim, Vincent Rivera, and Michael Aaronson

(together with Kim and Rivera, the "Individual Defendants," and collectively

with the City, "Defendants"), claiming the creation of a hostile work

environment, as well as discrimination and retaliation, during Plaintiff's

employment at the New York City Comptroller's Office (the "Comptroller's

Office").  The operative pleading in this case, Plaintiff's Third Amended

Complaint (or "TAC"), advances claims under 42 U.S.C. §§ 1981 and 1983;

Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17; New

York Civil Service Law § 75-b; and the New York City Human Rights Law,

N.Y.C. Admin. Code §§ 8-101–8-131 ("NYCHRL").  Defendants have moved to

dismiss the TAC, arguing procedural and pleading deficiencies.  For the

reasons that follow, the Court dismisses Plaintiff's NYCHRL claims without prejudice, and her remaining claims with prejudice.

## A.    Factual Background

Despite having had three opportunities to amend her complaint, Plaintiff is strikingly imprecise in alleging the roles of the individuals involved in Plaintiff's claims, their respective job duties, and even their interactions with her. What is more, the events allegedly underlying Plaintiff's claims are sporadic and often disjointed. With those caveats in mind, the Court proceeds to discuss Plaintiff's factual allegations in chronological order.

### 1.    The Parties

Plaintiff is "an African-American female of Haitian descent." (TAC ¶ 7). She began her employment at the Comptroller's Office on or about March 3, 1997, with the title "Claims Specialist Level 2." (*Id.* at ¶¶ 16-17). Plaintiff was subsequently promoted in May 1999 after roughly two years of work to the title of "Claims Manager/Administrative Claims Examiner." (*Id.* at ¶ 20). Plaintiff held this title for over 15 years until, as relevant to many of her claims, she was demoted in January 2016. (*Id.* at ¶ 21).

---

[1]    This Opinion draws its facts from the well-pleaded allegations of the Third Amended Complaint ("TAC" (Dkt. #39)), and one or more documents of which the Court can properly take notice, which documents are discussed later in the text. For ease of reference, the Court refers to Defendants' Memorandum of Law in Support of Their Motion to Dismiss as "Def. Br." (Dkt. #33); Defendants' Supplemental Memorandum of Law as "Def. Supp. Br." (Dkt #48); Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss as "Pl. Opp." (Dkt. #52); and Defendants' Reply Memorandum of Law in Support of Their Motion to Dismiss as "Def. Reply" (Dkt. #56).

Defendants consist of the City of New York, within which sits the Comptroller's Office; and three individuals, each of whom served as Plaintiff's supervisor in some capacity during her tenure at the Comptroller's Office. Rivera served as Plaintiff's direct supervisor from the time of her transfer to the Department of Education Team[2] in December 2013 until Rivera's eventual retirement in July 2016. (TAC ¶¶ 12, 15). Aaronson served as Rivera's direct supervisor at all times relevant to Plaintiff's Complaint. (*Id.* at ¶ 59). Plaintiff alleges that in this position, Aaronson had the ability to transfer staff to different divisions, to assign staff to physical cubicles, and to complete job performance evaluations for Division Chiefs. (*Id.* at ¶¶ 25, 41, 44). Kim held the position of Assistant Comptroller during the relevant period. (*Id.* at ¶ 10).[3]

### 2. Plaintiff's 2013 Administrative Claims

Plaintiff's earliest grievances in this action stem from administrative claims for discrimination that she filed on or about August 23, 2013, jointly with the New York State Division of Human Rights ("SDHR") and the Equal Employment Opportunity Commission ("EEOC"). (TAC ¶ 22). Although the TAC does not offer any detail as to what catalyzed those claims, it recites that the alleged discrimination was "based upon race/color, and retaliation for

---

[2] The TAC provides scant detail regarding the function of any units or teams within the Comptroller's Office.

[3] The TAC does not state clearly over whom Kim had *direct* supervisory responsibility as Assistant Comptroller, although Plaintiff does allege that Kim had some supervisory responsibility over her. (TAC ¶ 10). Details as to Kim's responsibilities include allegations concerning his role (along with the Comptroller) in "putting together the qualifications requirement" for an employment examination discussed more fully in the text, and in making final demotion and salary decisions for staff. (*Id.* at ¶¶ 75, 124).

opposing unlawful employment action." (*Id.*). Defendant Michael Aaronson is the only one of the current defendants who is also named in the 2013 filings. (*Id.* at ¶ 23).

Several months after filing the SDHR and EEOC charges, in December 2013, Plaintiff was transferred within the Comptroller's Office from the No-Fault Division to the Department of Education Team within the Bureau of Law and Adjustment. (TAC ¶ 25). This transfer occurred over Plaintiff's objection, which she explains was predicated on a fear of retaliation by supervisors in the Bureau of Law and Adjustment. (*Id.*).[4] Following the transfer, Plaintiff complained to Comptroller John Liu that the transfer itself was retaliatory. (*Id.* at ¶ 26).

In January 2014, while Plaintiff's administrative claims were pending, Aaronson assigned Karen Cohen — an individual named in Plaintiff's administrative claims — to a cubicle adjacent to Plaintiff's. (TAC ¶¶ 23, 44). According to Plaintiff, Cohen was not a member of Plaintiff's unit, "and there were other available cubicles at the time where Aaronson could have assigned Ms. Cohen." (*Id.* at ¶ 44). Plaintiff alleges that she "could not do anything in her work cubicle without Ms. Cohen knowing," and that Cohen often stood up in her cubicle to observe Plaintiff throughout the workday. (*Id.* at ¶ 45). Plaintiff found Cohen's actions to be "very unsettling," and voiced her discomfort to Defendant Aaronson via email. (*Id.* at ¶ 46). Despite her

---

[4]     The TAC does not explain why Plaintiff held such a fear of retaliation.

complaint, Plaintiff remained in the same situation until July 2014, when

Cohen left the Comptroller's Office. (*Id.* at ¶ 49). During this period, it was

"very stressful" for Plaintiff to go into the office. (*Id.*).

Ultimately, the SDHR dismissed Plaintiff's charge on or about June 2,

2014, citing "insufficient evidence to support a finding of probable cause for the

alleged discrimination." (TAC ¶ 24).

### 3. The Alleged Failure to Complete Performance Evaluations

Plaintiff also complains about her failure to receive annual job

performance evaluations for the years 2011 through 2014, even though the

Comptroller's Office maintained a "practice and policy" of completing such

evaluations. (TAC ¶¶ 41-42). In or about August 2014, Plaintiff complained of

the absence of such evaluations in her personnel file via email to Assistant

Comptroller Amedeo D'Angelo and copied Aaronson on the message. (*Id.* at

¶ 51).

In or about 2015, Plaintiff again voiced her concerns regarding the

absence of performance evaluations, this time to her supervisor, Debra Sencer.

(TAC ¶ 41). Plaintiff was advised that until Aaronson completed the

evaluations for the Division Chiefs, no evaluations for staff in the No-Fault

Division would be completed. (*Id.*). Plaintiff alleges that at the Comptroller's

Office, in the absence "of a job performance evaluation," an employee would be

in the "unenviable position of not being seriously considered for promotions, certain job assignments, or bonuses." (*Id.* at ¶ 43).[5]

### 4. Rivera's Alleged Advances Toward Plaintiff

When Plaintiff was transferred to the Department of Education Team in December 2013, Rivera, who was a supervisor in Plaintiff's new division, "began complaining to Mohan that he was not very happy with his domestic situation[.]" (TAC ¶ 28). Additionally, Rivera "informed Mohan that he would soon retire and, as a result would not need some of the personal equipment which he had at the office[.]" (*Id.* at ¶ 31). Over the course of the ensuing nine months, Rivera began giving Plaintiff items he held in his office, which gifts Plaintiff accepted. (*Id.* at ¶ 32). But after giving Plaintiff a coffee maker in the third quarter of 2015, Rivera announced to Plaintiff that "he had a sexual interest in [her]"; Plaintiff rebuffed this advance, stating "in very clear terms that she would not engage in sexual relations with [him.]" (*Id.* at ¶¶ 33-35).

"A few days after Rivera openly expressed his desire to have a sexual relationship with Mohan, Rivera told Mohan to 'forget' that they ever had the conversation about his sexual desire[.]" (TAC ¶ 36). But according to Plaintiff, the damage was done: Not long after Plaintiff rebuffed Rivera, he "began nit-picking [Plaintiff]'s work" and "became much more critical of Mohan's work at the office, a problem which Mohan never had when she began working under

---

[5] Plaintiff does not allege an adverse employment action caused by the failure to receive performance evaluations. Instead, she alleges that "[t]he failure to complete [Plaintiff's] job performance evaluations and the re-assignment of Ms. Cohen to a cubicle next to [Plaintiff] was both retaliation and intentional creation of a hostile work environment[.]" (TAC ¶ 50).

Rivera[.]" (*Id.* at ¶ 37). Plaintiff claims these events caused her "great mental anguish." (*Id.* at ¶ 38).

### 5. Plaintiff's 2015 Complaint

In September 2015, while still working in the Department of Education Team under Rivera, Plaintiff voiced to Kim and Aaronson her belief that claims submitted to the Department of Education Team were being mishandled. (TAC ¶ 57). Specifically, Plaintiff related that "[c]laims in the Department of Education Team were not properly investigated before settlement," and that the "beneficiaries of the payments coming from these mishandled claims were Whites and the [rumors] in the office [were] that the payment beneficiaries were politically connected." (*Id.* at ¶¶ 55-56).

Shortly after Plaintiff made this report, "Mike Reder, a Claims Specialist, issued an instruction to Mohan, a Claims Manager, at the behest of Rivera and William Kuehl." (TAC ¶ 58).[6] The TAC offers no insight into the content of this instruction, save for Plaintiff's allegation that she found it "very offensive" and complained of it to a representative of the union to which Reder belonged, AFSCME District Council ("DC") 37. (*Id.* at ¶ 60). Additionally, Plaintiff sent an email detailing Reder's conduct to Rivera and William Kuehl. (*Id.* at ¶ 61). "Neither Rivera nor Mr. Kuehl ever responded to [Plaintiff's] email on the subject." (*Id.*). Plaintiff adds that at the time of the offending instruction, Aaronson was Rivera's immediate supervisor, and she surmises that "Reder

---

[6] The only information offered in the TAC as to William Kuehl's role or responsibility within the Comptroller's Office is the allegation that he served in some managerial capacity along with Rivera on the Department of Education Team. (TAC ¶ 116).

would not have taken the aforesaid actions without the prior encouragement or acquiescence of Aaronson and Rivera." (*Id.* at ¶ 59).

Following the incident with Reder, after September 24, 2015, Plaintiff began receiving a "far [lower] number of claims" in her work at the Comptroller's Office. (TAC ¶ 62). Plaintiff reported this development in an email to Kevin Jordan,[7] copying Rivera and Aaronson. (*Id.*). Also on or about September 24, 2015, Rivera called a meeting with Plaintiff, during which he instructed her "not to write notes or comments regarding the identification of third-party claims prior to releasing the claims to be worked on by Claims Specialists Level 3." (*Id.* at ¶ 63). When Plaintiff objected to this directive, "Rivera became very agitated" and refused Plaintiff's request to put the directive in writing. (*Id.* at ¶ 65). On or about September 25, 2015, Plaintiff "sent an email to Aaronson and cc'd Kim detailing some of these things." (*Id.* at ¶ 66).

On October 8, 2015, following the episode with Rivera, Plaintiff met with Allen Fitzer of the Comptroller's General Counsel's Office to discuss Plaintiff's refusal to follow Rivera's instructions. (TAC ¶ 69). Plaintiff recalls that the meeting involved a potential charge of insubordination. (*Id.*). She clarifies, however, that she "was never found guilty of any act of insubordination," "[n]or was [she] given any formal written charge of insubordination." (*Id.* at ¶ 74).

---

[7] The TAC provides no information as to Kevin Jordan's job title or responsibilities within the Comptroller's Office.

### 6.     Plaintiff's 2016 Demotion and Subsequent Events

The key employment action involving Plaintiff occurred in January 2016. On or about January 11, 2016, Kim held a meeting with Plaintiff in which he notified her that "as part of the restructuring of the department, Mohan was being demoted from her Claims Manager/Administrative Claims Examiner title." (TAC ¶ 75). "Kim also told Mohan at the same meeting that Mohan's salary was being reduced by about $5,000 and that Mohan was being transferred to the Affirmative Unit." (*Id.*).

Following her demotion, Plaintiff complained that Kim was targeting her because of her race — she was the only non-white woman in her unit, and the only person in the unit whose salary was being reduced as a result of departmental restructuring. (TAC ¶ 76). As evidence of Kim's racial animus, Plaintiff notes that a year prior to her demotion, in or about February 2015, "Kim was known to have told" the Chief of the Property Damage Division "that there was a 'Black guy' that he and upper management did not like in the Property Damage Division" and that the Chief "should get rid of" him. (*Id.* at ¶ 78).[8]  Additionally, Plaintiff alleges that, "[u]pon information and belief," Maria Giordano, a White female with the same title as Plaintiff, had not been demoted despite being "banned from the Brooklyn and Bronx courthouses from negotiating and settling claims with the NYC Law Department due to her persistent disrespect for judges and plaintiffs' attorneys," and despite having

---

[8]     The chief did not ultimately follow this suggestion.  (TAC ¶ 96).

had "the Hearing Division and Sidewalk/Personal Injury Teams taken away from her[.]" (*Id.* at ¶ 97). Plaintiff attributes the difference in treatment between herself and Giordano to race. (*Id.* at ¶ 99).

On or about March 14, 2016, "Rivera gave [Plaintiff] a below average job performance [e]valuation," which Plaintiff contends was intended "to retroactively justify" her January demotion. (TAC ¶ 79). Still, and somewhat confusingly, the TAC recites that "no evaluation of Mohan was done for 2015." (*Id.*). Subsequently, during a meeting on April 25, 2016, Kim advised Plaintiff of his intention to reinstate her, and expressed contrition that he had "made a mistake about [Plaintiff]'s title and salary." (*Id.* at ¶ 80). "Kim further stated that Rivera was about to retire and ... Kim[] would make sure that no negative evaluation ... would be put in [Plaintiff]'s personnel file." (*Id.*). Kim asked Plaintiff and the other attendee of the meeting, DC 37 Local Union Representative Juliet White, to keep what was said at the meeting confidential. (*Id.*).

In point of fact, Plaintiff's salary and title were never restored. (TAC ¶ 82).[9] To the contrary, Plaintiff alleges that White received a raise of over $4,000 after this suit commenced, which raise Plaintiff claims was "intended to ... dissuade [White] from testifying truthfully" about what Kim said at the April 2016 meeting. (*Id.* at ¶¶ 83-84).

---

[9]     The TAC does not indicate whether a negative performance evaluation from Rivera was placed in Plaintiff's personnel file.

Following Rivera's retirement in or about August 2016, "it was discovered that [Plaintiff's] complaints about the mismanagement and mishandling of claims were in fact substantiated." (TAC ¶ 85).[10]  In response, Plaintiff "sent an email to Khanim Babayeva, an employee of the Internal Audit Unit of the General Counsel's Office … specifically invoking protection under the New York Whistleblower Protection Law." (*Id.* at ¶ 88).  Subsequently, on or about December 29, 2016, Plaintiff filed discrimination and retaliation claims with the EEOC and a whistleblower complaint with the New York City Department of Investigation ("DOI").  (*Id.* at ¶¶ 86-87).  In some tension with her current claims, Plaintiff's DOI complaint attributes her January 2016 demotion to her identification of the alleged mismanagement of claims in September 2015, and not to her race or national origin.  (*Id.* at ¶ 87).

"On February 22, 2017, the EEOC issued a Notice of Right to Sue letter to Mohan regarding her EEOC Title VII filing." (TAC ¶ 89).  The TAC provides no similar information regarding the resolution of the DOI complaint.

### 7.    The 2017 Administrative Claims Examiner Exam

Finally, Plaintiff alleges that in or about November 2017, the City of New York "published a Notice of Examination for [the] Administrative Claims Examiner position[.]" (TAC ¶ 123).  For Plaintiff, being promoted to Administrative Claims Examiner would entail a corresponding raise in salary. (*See id.* at ¶ 128).  Plaintiff "submitted the necessary paperwork in a timely

---

[10]    Plaintiff contends, "[f]or example, a lot of the DOE claims had been marked Action Started when that was not the case," and "[s]ome claims were taken off workflow and paid when they should not have been paid."  (TAC ¶ 85).

manner to take the examination," but received a Disqualification Notice indicating that she did not qualify to take the exam. (*Id.* at ¶¶ 125-26). Plaintiff later unsuccessfully appealed her disqualification. (*Id.* at ¶ 126).

The Notice of Examination states that the exam is "only for employees provisionally employed in the title Administrative Claim Examiner," and further provides, in a section entitled "Minimum Qualification and New York City Employment Requirements," that applicants "must be currently employed by New York City as a provisional Administrative Claim Examiner and have served as a provisional Administrative Claim Examiner for at least two (2) years[.]" ("Notice of Examination" (Def. Supp. Decl., Ex. E (Dkt. #49-1))). Despite specific allegations in the TAC that she was demoted from the position of "Claims Manager/Administrative Claims Examiner" (TAC ¶ 75), Plaintiff contends that her disqualification was *not* the result of her lacking the requisite employment level to qualify for the exam, but rather was the result of a concerted effort to retaliate against her for filing the instant lawsuit (*id.* at ¶ 127). In this regard, Plaintiff alleges that "Kim and the Comptroller were in contact with those within [the City of New York] who were responsible for" determining the qualification requirements, and that the two men "had some input with regard to the qualification for the examination." (*Id.* at ¶ 124). From this, Plaintiff posits that because Kim was "aware that [Plaintiff] did not hold the Administrative Claim Examiner title" at the time of submitting her application for the examination, the examination requirements were "written … in such a way to exclude" her specifically. (*Id.* at ¶ 127).

**B.      Procedural Background**

On May 21, 2017, Plaintiff filed the initial complaint in this action.  (Dkt. #1).  On September 20, 2017, Plaintiff amended her complaint.  (Dkt. #18).  On October 4, 2017, Plaintiff attempted to file a Second Amended Complaint ("SAC").  (Dkt. #21).  The SAC was deemed deficient, however, because Plaintiff had not received the Court's leave to file the SAC as required under Federal Rule of Civil Procedure 15(a)(2).  Plaintiff therefore sought leave to file the SAC on October 6, 2017, which application the Court granted that same day.  (Dkt. #22-23).

Following Plaintiff's refiling of the SAC, on October 20, 2017, Defendants requested a conference in anticipation of moving to dismiss the SAC, a request to which Plaintiff did not respond.  (Dkt. #27-28).  The Court granted the request on October 30, 2017, and held the pre-motion conference on December 22, 2017, at which conference the Court issued a briefing schedule for Defendants' motion to dismiss.  (Dkt. #28, 35).  On February 2, 2018, in accordance with the briefing schedule, Defendants submitted their motion to dismiss the SAC, along with supporting papers.  (Dkt. #32-33).

The Court thereafter granted a request by Plaintiff for an extension of time to respond to the motion.  (Dkt. #37-38).  Rather than filing a brief in opposition, Plaintiff again amended her complaint, submitting the TAC.  (Dkt. #39).  In response, the Court issued an order directing Plaintiff to show cause why the Court should not strike the TAC (Dkt. #40), and Defendants later indicated that they had not consented to Plaintiff filing the TAC (Dkt. #41).

Plaintiff submitted her response to the Court's order to show cause on March 20, 2018. (Dkt. #42). That same day, the Court allowed Plaintiff to refile the TAC, and also allowed Defendants to supplement their motion to dismiss in order to address any new issues raised in the amended pleading. (Dkt. #43).

Plaintiff responded to the Court's March 20 Order by submitting still another amended complaint on March 21, 2018. Defendants submitted a letter to the Court on March 22, 2018, objecting to Plaintiff's filing of, in essence, a Fourth Amended Complaint, and seeking sanctions. (Dkt. #45). After receiving Plaintiff's response to Defendants' letter (Dkt. #46), the Court struck the Fourth Amended Complaint, confirmed the TAC to be the operative pleading, and declined to impose sanctions (Dkt. #47).

On April 13, 2018, Defendants submitted a Supplemental Memorandum of Law and Declaration in support of their motion to dismiss. (Dkt. #48-49). Plaintiff filed an opposition to Defendants' motion on May 15, 2018 (Dkt. #52-53), to which Defendants replied on June 8, 2018 (Dkt. #56).

Plaintiff claims: (i) retaliation under § 1981, § 1983, and the NYCHRL, based on events following Plaintiff's submission of administrative discrimination charges in 2013; (ii) race discrimination, under § 1981, § 1983, and the NYCHRL, based on Plaintiff's 2016 demotion; (iii) a hostile work environment, under Title VII, § 1981, § 1983, and the NYCHRL, based on events occurring over the course of Plaintiff's employment; (iv) gender discrimination (phrased as "sex discrimination/sexual harassment"), under the

NYCHRL, based on the alleged interactions between Rivera and Plaintiff;

(v) retaliation, under the New York Civil Service Law § 75-b, based on Plaintiff's

2016 demotion; and (vi) "continuing retaliation," under § 1981, § 1983, and the

NYCHRL, based on Plaintiff's disqualification from taking the examination to

acquire the title of Administrative Claims Examiner after filing the instant suit.

(*See generally* TAC ¶¶ 91-130).

**DISCUSSION**

**A.     Applicable Law**

> **1.     Motions to Dismiss Under Federal Rule of Civil
> Procedure 12(b)(6)**

When considering a motion to dismiss under Rule 12(b)(6), a court

should "draw all reasonable inferences in [the plaintiff's] favor, assume all well-

pleaded factual allegations to be true, and determine whether they plausibly

give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98,

104 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Selevan* v. *N.Y.

Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)). "To survive a motion to

dismiss, a complaint must contain sufficient factual matter, accepted as true,

to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570

(2007)). However, "the tenet that a court must accept as true all of the

allegations contained in a complaint is inapplicable to legal conclusions.

Threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice." *Id.* That is, a complaint must plead

"factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

"While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [a plaintiff's] claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (per curiam) (quoting *Twombly*, 550 U.S. at 570). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

## 2. Documents the Court May Consider When Ruling on a Motion to Dismiss

On a motion to dismiss, the court must typically confine its consideration to a "narrow universe of materials" and may "not look beyond facts stated on the face of the complaint, documents appended to the complaint or incorporated in the complaint by reference, and matters of which judicial notice may be taken." *Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (alterations and internal quotation marks omitted) (quoting *Concord Assocs. L.P.* v. *Entm't Props. Tr.*, 817 F.3d 46, 51 n.2 (2d Cir. 2016)). The Second Circuit has interpreted incorporation by reference to require "a clear, definite, and substantial reference to the documents." *DeLuca* v. *AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010) (quoting *Helprin* v. *Harcourt, Inc.*, 277 F. Supp. 2d 327, 330-31 (S.D.N.Y. 2003)). Still, "[m]inor references … cannot be said to be an express adoption or incorporation." *Tigue* v. *U.S. Dep't of Justice*, 312 F.3d 70, 81 (2d Cir. 2002).

"Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc.* v. *Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)). "To be integral to a complaint, the plaintiff must have [i] 'actual notice' of the extraneous information and [ii] 'relied upon th[e] documents in framing the complaint.'" *DeLuca*, 695 F. Supp. 2d at 60 (last alteration in original) (quoting *Chambers*, 282 F.3d at 153). "Merely mentioning a document in the complaint will not satisfy this standard; indeed, even offering 'limited quotation[s]' from the document is not enough." *Goel*, 820 F.3d at 559 (quoting *Global Network Commc'ns, Inc.* v. *City of New York*, 458 F.3d 150, 156 (2d Cir. 2006)). Further, "even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity, [relevance,] or accuracy of the document." *DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (quoting *Faulkner* v. *Beer*, 463 F.3d 130, 134 (2d Cir. 2006)).

Defendants have submitted numerous documents along with their motion papers. The Court considers only one in the context of Defendants' Rule 12(b)(6) claims: the Notice of Examination for the position of Administrative Claim Examiner issued by the New York City Department of Citywide Administrative Services. (Def. Supp. Decl., Ex. E). Despite Plaintiff's contestations to the contrary, she explicitly references this document in the

TAC, and indeed, her "continuing retaliation" claim hinges on its terms.  (*See, e.g.*, TAC ¶ 123 ("In or about November 2017, [the City of New York] published a Notice of Examination for Administrative Claim Examiner position[.]")).  It is thus clear that Plaintiff was aware of this document and relied upon it in drafting the TAC.  *See DeLuca*, 695 F. Supp. 2d at 60.

## C.    Analysis

### 1.    Plaintiff Has Failed to Plead Adequately Claims for Retaliation and Race Discrimination Under §§ 1981 and 1983

#### a.    Applicable Law

The Court considers first Plaintiff's claims for retaliation and race discrimination under 42 U.S.C §§ 1981 and 1983.[11]  In particular, Plaintiff claims (i) retaliation following her 2013 SDHR and EEOC filings; (ii) race discrimination in the form of her demotion; and (iii) retaliation for filing the instant suit.  None of these claims is adequately pleaded, and the Court therefore dismisses each with prejudice.

The Court begins its analysis by outlining, in general terms, the interplay between the two statutes at issue.  On one hand, § 1981 proscribes discrimination in the "enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment." *Patterson* v. *Cty. of Oneida, N.Y.*, 375 F.3d 206, 224 (2d Cir. 2004).  To state a claim under § 1981, a plaintiff must allege facts establishing (i) that he or she is a racial minority; (ii) the defendants' "intent to discriminate on the basis of race"; and

---

[11]    Because Plaintiff's hostile work environment claim is premised on these statutes as well as Title VII, the Court addresses the claim separately.  *See infra* Section C.2.

(iii) discrimination in the context of one of the activities covered by the statute, including employment. *Brown* v. *City of Oneonta, N.Y.*, 221 F.3d 329, 339 (2d Cir. 2000); *see Juarez* v. *Northwestern Mut. Life Ins. Co., Inc.*, 69 F. Supp. 3d 364, 367 (S.D.N.Y. 2014) (applying standard to employment discrimination).

Section 1983, on the other hand, "affords no substantive rights on its own and simply provides a remedy for a deprivation of federal statutory or constitutional rights, such as those codified at § 1981." *Colon* v. *City of N.Y.*, No. 16 Civ. 6425 (KPF), 2018 WL 740992, at *4 (S.D.N.Y. Feb. 6, 2018) (citing *City of Okla. City* v. *Tuttle*, 471 U.S. 808, 816 (1985); *Patterson*, 375 F.3d at 225). "Indeed, 'the express cause of action for damages created by § 1983 constitutes the *exclusive* federal remedy for violation of the rights guaranteed in § 1981 by state governmental units[.]" *Villar* v. *City of New York*, 135 F. Supp. 3d 105, 140 (S.D.N.Y. 2015) (quoting *Patterson*, 375 F.3d at 225). Plaintiff has not identified any constitutional bases for her claims, and the Court thus construes Plaintiff's § 1983 claims as depending on the rights conferred under § 1981.

The Second Circuit has identified two important differences between employment discrimination claims brought under §§ 1981 and 1983 and those brought under Title VII: *First*, when claims under §§ 1981 and 1983 are raised against a municipality — as they are here — "the plaintiff is required to show that the challenged acts were performed pursuant to a municipal policy or custom." *See Patterson*, 375 F.3d at 226. *Second*, claims under §§ 1981 and 1983 require a showing of discriminatory intent, whereas a Title VII claim can

be sustained on mere negligence. *Id.* Thus, even if the Court were to find a minimal inference of discrimination, Plaintiff's pleadings would also need to establish a municipal policy and indicia of discriminatory intent.

Finally, "[a]n individual may be held liable under §§ 1981 and 1983 only if that individual is personally involved in the alleged deprivation." *Littlejohn* v. *City of New York*, 795 F.3d 297, 314 (2d Cir. 2015) (internal quotation marks and citations omitted). "To lay a proper foundation for individual liability, the plaintiff must plead specific, nonconclusory factual allegations to establish the participation at the necessary mental state of the individual defendants, or [his or her] claims against them will be dismissed." *Bermudez* v. *City of N.Y.*, 783 F. Supp. 2d 560, 602 (S.D.N.Y. 2011) (quoting *Stevens* v. *New York*, 691 F. Supp. 2d 392, 400 (S.D.N.Y 2009)).

### b. Plaintiff's Retaliation and Race Discrimination Claims Are Timely

The statute of limitations for claims under § 1983 depends on the law of the state in which the claims are brought; in New York, the applicable statute of limitations is three years. *Patterson*, 375 F.3d at 225. The statute of limitations applicable to claims under § 1981 is also three years, except where, as here, the claims arose out of a post-1990 congressional act such as the 1991 amendments to § 1981, which amendments pertain to discrimination in contractual relationships, including those in the employment context; for these claims, the applicable statute of limitations is four years. *See Jones* v. *R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004) (holding that four-year statute of limitations under 28 U.S.C. § 1658 applies to § 1981 claims for hostile work

environment, wrongful termination, and failure to transfer); *see also Whitley* v. *Montefiore Med. Grp.*, No. 13 Civ. 4126 (LTS), 2016 WL 1267788, at *7 (S.D.N.Y. Mar. 30, 2016). Under either statute, a claim accrues at the moment when "the plaintiff becomes aware that [she] is suffering from a wrong for which damages may be recovered in a civil action." *Eagleston* v. *Guido*, 41 F.3d 865, 872 (2d Cir. 1994) (quoting *Singleton* v. *City of New York*, 632 F.2d 185, 192 (2d Cir. 1980))).

Because Plaintiff initiated this action on May 21, 2017, the earliest date by which a timely claim could have accrued under § 1981 is May 21, 2013, and under § 1983 is May 21, 2014. Here, Plaintiff's retaliation and race discrimination claims accrued after May 21, 2014, and are therefore timely.

The earliest wrong that Plaintiff alleges in support of her first retaliation claim (i.e., the one attributed to her filing of the 2013 SDHR and EEOC complaints) is the refusal to move Plaintiff away from Karen Cohen's cubicle after May 22, 2014. (TAC ¶ 92 (listing actions that "defendants took against [Plaintiff] since May 22, 2014")).[12] Plaintiff separately asserts a second claim, one for "continuing retaliation," that alleges that, as a result of filing the instant lawsuit, the requirements for the Administrative Claim Examiner Exam, posted in November 2017, were deliberately crafted in a manner to disqualify

---

[12]    The fortuity of this alleged date, in light of the cutoff date of May 21, 2014, is not lost on the Court. However, Plaintiff's careful pleading may have won the battle but lost the war: By dating the first retaliatory act after May 21, 2014, Plaintiff has avoided a limitations bar, but, as discussed further in the text, in pleading retaliatory acts that took place long after the protected conduct of August 2013, Plaintiff has failed to allege a viable claim for retaliation.

her.  (*Id.* at ¶¶ 122-28).  All events giving rise to the second retaliation claim occurred at or about the posting of the exam requirements in November 2017, and thus this claim also falls within the statute of limitations.

Plaintiff's race discrimination claim is also premised on alleged facts that fall within the limitations periods of both statutes.  The claim is based on the allegation that in January 2016, Plaintiff was demoted as a consequence of race discrimination on the part of her supervisors.  (*See* TAC ¶¶ 94-101).

### c.    Plaintiff's Retaliation and Race Discrimination Claims Fail to State a Claim

Although Plaintiff's §§ 1981 and 1983 claims are timely, they are inadequately pleaded.  As explained below, Plaintiff fails to support her retaliation claims with facts establishing the requisite causal connection, and her "continuing retaliation" claim also fails to satisfy the plausibility standard.  In addition, Plaintiff fails to establish that any of the Individual Defendants acted with the intent necessary to support her race discrimination claim.

### i.    Plaintiff's Retaliation Claims Fail

To state a claim for retaliation under §§ 1981 and 1983, a complaint must contain allegations that (i) the "defendants discriminated — or took an adverse employment action — against [the plaintiff]," (ii) "'because' [the plaintiff] opposed any unlawful employment practice."  *Vega* v. *Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015) (construing Title VII); *see Lewis* v. *Roosevelt Island Operating Corp.*, 246 F. Supp. 3d 979, 990 n.6 (S.D.N.Y. 2017) ("The standard for retaliation under Title VII, § 1981, [and] § 1983 ... is the same." (collecting cases)).  To establish that a plaintiff's

engagement in protected activity was causally connected to the adverse employment action, the plaintiff may rely on temporal proximity between the two events; however, "the plaintiff must plausibly allege that the retaliation was a 'but-for' cause of the employer's adverse action." *Vega*, 801 F.3d at 90. In other words, "[i]t is not enough that retaliation was a 'substantial' or 'motivating' factor in the employer's decision." *Id.* at 87 (quoting *Univ. of Tex. Sw. Med. Ctr.* v. *Nassar*, 570 U.S. 338, 361 (2013)).

The first charge Plaintiff brings against the Individual Defendants is for retaliation following her April 2013 filing of a charge of workplace discrimination with the SDHR and EEOC. (TAC ¶ 22). To support the claim, Plaintiff alleges that she was subjected to adverse employment actions beginning in 2014, including denial of her request to move cubicles, deprivation of annual written performance reviews, and receipt of below-average performance review in March 2016. (*Id.* at ¶¶ 91-93). As noted, Plaintiff does not allege that she experienced any retaliatory action attributable to her April 2013 filing until May 22, 2014. (*Id.* at ¶ 92).

Defendants do not dispute that the 2013 SDHR and EEOC complaints each qualify as protected activity. (Def. Br. 20). Instead, Defendants focus on the lack of any causal connection between Plaintiff's engagement in that protected activity and any adverse employment action that she claims to have suffered. The Court agrees with Defendants. On the face of the TAC, the Court cannot find that retaliation was the but-for cause of any of Plaintiff's alleged adverse employment actions.

The retaliatory acts that Plaintiff alleges Defendants committed in response to her 2013 complaints occurred more than a year after their filing, and even then, constitute nonactionable, "petty slights or minor annoyances." *Burlington N. & Santa Fe Ry. Co.* v. *White*, 548 U.S. 53, 57 (2006). Courts have held comparable lapses in time between protected activity and putative adverse employment action to be too attenuated to establish causation. *See Clark Cty. Sch. Dist.* v. *Breeden*, 532 U.S. 268, 273 (2001) ("[C]ases that accept mere temporal proximity … as sufficient evidence of causality to establish a prima facie case uniformly hold that temporal proximity must be 'very close.'" (collecting cases finding three- and four-month periods insufficient)); *McManamon* v. *Shinseki*, No. 11 Civ. 7610 (PAE), 2013 WL 3466863, at *13 (S.D.N.Y. July 10, 2013) (holding three and a half months to be "outside of the acceptable limit for establishing temporal proximity to show a causal relationship"); *Murray* v. *Visiting Nurse Servs. of N.Y.*, 528 F. Supp. 2d 257, 275 (S.D.N.Y. 2007) ("[D]istrict courts within the Second Circuit have consistently held that the passage of two to three months between the protected activity and the adverse employment action does not allow for an inference of causation." (collecting cases)).

To be sure, "courts within this Circuit have been willing to look past a significant passage of time when the defendant took advantage of the first available opportunity to retaliate." *Silverio* v. *United Block Ass'n, Inc.*, No. 13 Civ. 5001 (AJN), 2015 WL 221151, at *8 (S.D.N.Y. Jan. 14, 2015). Plaintiff has not, however, alleged that here: Supervisors in Plaintiff's department could

have written her an unfavorable performance review and/or demoted her at the end of 2013, but did not. In short, the lack of temporal proximity here does not suggest a lack of opportunity for the Individual Defendants to retaliate, but rather a lack of intent to do so.[13]

Plaintiff's "continuing retaliation" claim — alleging that Kim conspired with other City employees to impose qualification requirements that Plaintiff alone could not meet, in retaliation for her bringing the instant suit — fares no better. (*See* TAC ¶¶ 124-27). To sit for the exam, applicants were required to be "currently employed by New York City as a provisional Administrative Claim Examiner" (Notice of Examination); as Plaintiff alleges, she had been demoted from her position as "Claims Manager/Administrative Claim Examiner" in January 2016 (TAC ¶¶ 20-21). Put simply, Plaintiff's own timeline imperils her claim. For one thing, Plaintiff alleges that the City published the notice of the examination "[i]n or about November 2017," and that Kim "had some input with regard to the qualification for the examination" (*id.* at ¶¶ 123-24), yet Plaintiff initiated this suit in May of 2017, thus separating these events by approximately five months. This timeframe is also too attenuated to support an inference of causal connection. *See McManamon*, 2013 WL 3466863, at *13; *Murray*, 528 F. Supp. 2d at 275. More fundamentally, however, the Court

---

[13]    Plaintiff's claim regarding the failure to prepare annual evaluations also fails for want of plausibility. That is, Plaintiff does not contest the response that she was given, namely, that the failure to complete evaluations as to her was the product of Aaronson's failure to complete reviews as to the Division Chiefs. Plaintiff does not suggest here that this explanation was pretext, and cannot allege that this office-wide backlog in completing evaluations was crafted in retaliation for any conduct of hers.

finds wholly implausible Plaintiff's supposition that Defendant Kim conspired with other municipal employees to impose exam requirements that would be applicable to a wealth of potential examinees throughout the City other than Plaintiff, *solely* to punish Plaintiff for bringing this litigation. Plaintiff pleads no facts corroborating the allegation that Kim or any other employee of the City of New York engaged in such planning or discussions, and the Court will not allow Plaintiff to proceed to discovery on rank speculation. *See Iqbal,* 556 U.S. at 678. Because the TAC fails to state claims for retaliation under §§ 1983 and 1981 against the Individual Defendants (and, by extension, the City), those claims are accordingly dismissed.

### ii. Plaintiff's Race Discrimination Claims Fail[14]

The Court next assesses Plaintiff's claim that her January 2016 demotion constituted discrimination on the basis of race. (TAC ¶¶ 94-101). To state a claim for race discrimination, a plaintiff must allege (i) "that she is a member of a protected class," (ii) "that she was qualified for the position she sought," (iii) "that she suffered an adverse employment action," and (iv) "facts suggesting an inference of discriminatory motivation[.]" *Littlejohn,* 795 F.3d at 311. Plaintiff falters on the element of discriminatory motivation. In attempting to establish such motivation, Plaintiff proffers the theories that she received disparate treatment as compared to a single White coworker, and that

---

[14] Though Plaintiff references her Haitian national origin in the TAC, she does not claim disparate treatment on that basis, but rather only claims that her national origin was a factor in the hostile work environment to which she was subjected. (*See* TAC, Third Cause of Action).

Kim directed the termination of a Black coworker.  The Court addresses these theories in the remainder of this section.

"A showing that the employer treated a similarly situated employee differently is 'a common and especially effective method' of establishing a prima facie case of discrimination[.]"  *McGuinness* v. *Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001) (quoting *Abdu-Brisson* v. *Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001)).  Although such a comparator need not be "*identically* situated" to the plaintiff, he or she "must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination."  *Id.* at 54.  At the pleading stage, "[t]o establish an inference of discrimination, a plaintiff must allege that she was similarly situated in all material respects to the individuals with whom she seeks to compare herself."  *Brown* v. *Daikin*, 756 F.3d 219, 230 (2d Cir. 2014) (internal quotation marks omitted); *see also Wegmann* v. *Young Adult Inst., Inc.*, No. 15 Civ. 3815 (KPF), 2016 WL 827780, at *10 (S.D.N.Y. Mar. 2, 2016) (finding that plaintiff was not similarly situated to comparators where she did not plead facts about the position, responsibilities, tenure, or experience of the comparators).

"Employment characteristics which can support a finding that two employees are 'similarly situated' include 'similarities in education, seniority, performance, and specific work duties.'"  *Sollazzo* v. *Just Salad Rest.,* No. 15 Civ. 252 (ER), 2018 WL 1273661, at *6 (S.D.N.Y. Mar. 5, 2018) (quoting *DeJesus* v. *Starr Tech. Risks Agency, Inc.*, No. 03 Civ. 1298 (RJH), 2004 WL

2181403, at *9 (S.D.N.Y. Sept. 27, 2004)).  Similar work duties include "similar requirements for skill, effort, and responsibility for jobs performed 'under similar working conditions.'"  *Id.* at *6 (quoting *DeJohn* v. *Wal-Mart Stores E., LP*, 09 Civ. 01315 (GTS), 2013 WL 1180863, at *6 (N.D.N.Y. Mar. 20, 2013)); *see also Graham* v. *Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000) ("What constitutes 'all material respects' ... varies somewhat from case to case" but "must be judged based on [i] whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and [ii] whether the conduct for which the employer imposed discipline was of comparable seriousness." (citations omitted)).

Here, Plaintiff relies on the difference in fates between her and an allegedly similarly situated White colleague, Maria Giordano.  (*See* TAC ¶¶ 97-100).  Plaintiff notes that Giordano held the same title as Plaintiff ("Administrative Claims Examiner/Claims Manager"), but alleges nothing else to support her contention that she and Giordano were in fact similarly situated.  Plaintiff fails to detail the specific work duties, seniority level, or performance of Giordano, beyond the isolated allegation that she has shown "persistent disrespect for judges and plaintiffs' attorneys," (*id.* at ¶ 97), and in so doing fails to provide the degree of detail necessary to compare her to Giordano.  Thus, even at this early stage in the litigation, the Court cannot find "a minimal inference that the difference of treatment may be attributable to discrimination" based on Plaintiff's allegations regarding Giordano. *McGuinness*, 263 F.3d at 54.

Beyond her attempted comparison with Giordano, Plaintiff also alleges that Kim, who informed Plaintiff of her 2016 demotion, advocated unsuccessfully for the termination of another Comptroller's Office employee, to whom Kim referred as "that 'Black guy.'" (TAC ¶ 94). The Second Circuit has made clear, however, "that stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination," unless the plaintiff also provides "other indicia of discrimination," in which case "the remarks can no longer be deemed 'stray,' and the jury has a right to conclude that they bear a more ominous significance." *Abdu-Brisson*, 239 F.3d at 468 (quoting *Danzer* v. *Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998)). Kim's alleged remark, made nearly one year before Plaintiff's demotion, about a different individual for whom there is no evidence of adverse employment action, is not tied to any other discriminatory indicia. Although the comment as alleged refers to race, it does not employ derogatory slurs or otherwise suggest that Kim directed the termination of the other employee *because* of his race. It is therefore inadequate, alone or in conjunction with Plaintiff's other proffered evidence, to establish the requisite discriminatory intent with regard to Plaintiff's demotion.

### 2. Plaintiff's Has Failed to Plead Adequately a Hostile Work Environment Claim

Plaintiff further alleges that Defendants violated Title VII, § 1981, and § 1983 by creating a hostile work environment consisting of "an ongoing, continuous, intentional pattern of discrimination" on the basis of her race and national origin. (TAC ¶ 103). Defendants contest the timeliness and factual

sufficiency of this claim as well.  Although the Court rejects Defendants'

timeliness arguments, it agrees that Plaintiff has failed to state a claim.[15]

### a.   Plaintiff's Hostile Work Environment Claims Are Timely Under Title VII, § 1981, and § 1983

#### i.   Title VII

Different statutes of limitations apply to claims under Title VII, § 1981,

and § 1983.  The Court begins by addressing the timeliness of Plaintiff's

Title VII claim.  "In New York, where the [SDHR] addresses complaints of

employment discrimination, any complaint must be filed with the [SDHR]

within 300 days of the alleged discriminatory act."  *Langford* v. *Int'l Union of*

*Operating Eng'rs, Local 30*, 765 F. Supp. 2d 486, 495 (S.D.N.Y. 2011) (citing 42

U.S.C. § 2000e-5(e)(1)).  A Title VII claim is similarly time-barred "if the

plaintiff, after filing a charge with an appropriate state or local agency, does not

file a charge with the EEOC within 300 days after "the alleged unlawful

employment practice.'"  *Elmenayer* v. *ABF Freight Sys., Inc.*, 318 F.3d 130, 133

(2d Cir. 2003) (quoting 42 U.S.C. § 2000e-5(e)(1)).

"When … a plaintiff's allegations of discrimination extend beyond the

300-day limitations period, the nature of the claim determines what

consideration will be given to the earlier conduct."  *Petrosino* v. *Bell Atl.*, 385

F.3d 210, 220 (2d Cir. 2004).  Where a plaintiff's Title VII claim alleges a hostile

---

[15]   Plaintiff's opposition memorandum presents no arguments in support of her hostile work environment claim, nor does it elucidate the TAC's threadbare factual allegations underlying the claim. (*See* Pl. Opp. 5-9).  Although the Court could properly consider this claim abandoned, *see, e.g.*, *Shannon* v. *Credit Agricole Sec. (USA) Inc.*, No. 17 Civ. 0667 (AJN), 2018 WL 1474390, at *5 (S.D.N.Y. Mar. 22, 2018) (deeming claims abandoned where plaintiff made no argument as to their timeliness in response to motion to dismiss), it declines to do so for the sake of completeness.

work environment, "the statute of limitations requires that only one [alleged discriminatory act] demonstrating the challenged work environment occur within 300 days of filing; once that is shown, a court and jury may consider 'the entire time period of the hostile environment' in determining liability." *Id.* (quoting *Nat'l R.R. Passenger Corp.* v. *Morgan*, 536 U.S. 101, 117 (2002)).

Plaintiff filed a Charge of Discrimination with the EEOC on December 29, 2016, alleging discrimination and retaliation. (TAC ¶ 86). Accordingly, a timely claim under Title VII requires a qualifying event that occurred on or after March 4, 2016. Although the TAC is far from precise as to the factual bases of Plaintiff's hostile work environment claim, the Court draws all reasonable inferences in Plaintiff's favor and considers "the entire time period of the hostile environment," *Morgan*, 536 U.S. at 117, to determine whether Plaintiff's Title VII claim is timely.

The event underpinning almost all of Plaintiff's claims is her January 11, 2016 demotion. (TAC ¶ 107). Plaintiff contends that this demotion was a discriminatory action undertaken by the Comptroller's Office on the basis of her race, given that none of her White colleagues was similarly demoted despite similar levels of performance. (*See, e.g.*, TAC ¶¶ 99-100). Although this allegation alone would be outside of the statute of limitations, Plaintiff also alleges that on March 14, 2016, following his heightened scrutiny of Plaintiff's work after she rejected his advances, Rivera completed a negative evaluation of Plaintiff to "cover up" the racial animus behind her demotion. (*Id.* at ¶¶ 81-82, 105-06). She further alleges that her union representative, Juliet White,

received a raise in salary sometime after April 25, 2016, also allegedly in an effort to dissuade her from corroborating Plaintiff's allegations. (*Id.* at ¶¶ 83-84). Whether or not these allegations satisfy Rule 12(b)(6), they suffice to render Plaintiff's hostile work environment claim under Title VII timely.[16]

### ii. Sections 1981 and 1983

As discussed above, the statute of limitations applicable to Plaintiff's § 1981 claims is four years, and to her § 1983 claims is three years, rendering Plaintiff's hostile work environment claims under these statutes timely if they accrued by, respectively, May 21, 2013, and May 21, 2014. As in the Title VII context, in determining whether a hostile work environment claim is timely under §§ 1981 and 1983, courts consider "the entire time period of the hostile environment," and whether any "act contributing to the claim occur[red] within the filing period[.]" *Morgan*, 536 U.S. at 117; *see, e.g., Washington* v. *Cty. of Rockland*, 373 F.3d 310, 317-18 (2d Cir. 2004) (applying standard to §§ 1981

---

[16] Defendant argues in passing that because Plaintiff's Charge of Discrimination with the EEOC alleges only claims of race and gender discrimination and retaliation, Plaintiff's Title VII claim for hostile work environment fails for failure to exhaust administrative remedies. (Def. Br. 8). The Court rejects this argument. To be sure, a Title VII plaintiff must exhaust any available administrative remedies before filing suit, but allegations within an administrative charge only need be "reasonably related" to the allegations in the complaint. *See Williams* v. *N.Y.C. Hous. Auth.*, 458 F.3d 67, 70 (2d Cir. 2006) (per curiam). "A claim is ... reasonably related if the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made." *Deravin* v. *Kerik*, 335 F.3d 195, 200-01 (2d Cir. 2003) (quoting *Fitzgerald* v. *Henderson*, 251 F.3d 345, 359-60 (2d Cir. 2001)). Given that the allegations underlying Plaintiff's discrimination and retaliation claims also underlie her hostile work environment claim, and that the Court does not have before it the contents of her EEOC charge, the Court cannot say that Plaintiff's hostile work environment claim is not reasonably related to the discrimination charges she presented to the EEOC. *See id.* at 201 ("In determining whether claims are reasonably related, the focus should be 'on the factual allegations made in the [EEOC] charge itself, describing the discriminatory conduct about which a plaintiff is grieving.'" (alteration in original) (quoting *Freeman* v. *Oakland Unified Sch. Dist.*, 291 F.3d 632, 637 (9th Cir. 2002)).

and 1983 claims).  The facts underlying Plaintiff's hostile work environment claim accrued no earlier than March 4, 2016, and this claim is therefore within the applicable limitations periods.

### b. Plaintiff's Hostile Work Environment Claims Fail

"A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Morgan*, 536 U.S. at 122 (discussing 42 U.S.C. § 2000e–5(e)(1)).  "It is axiomatic" that a hostile work environment claim is only actionable "when it occurs because of an employee's sex, or other protected characteristic." *LeLaurencio* v. *Brooklyn Children's Ctr., Superintendent*, 111 F. Supp. 3d 239, 248 (2d Cir. 2001) (quoting *Brown* v. *Henderson*, 257 F.3d 246, 252 (2d Cir. 2001)).  "To establish a hostile work environment under Title VII, § 1981, or § 1983, a plaintiff must show that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Littlejohn*, 795 F.3d at 320-21 (quotation marks and citations omitted).

"The incidents complained of must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Littlejohn*, 795 F.3d at 320-21 (citation omitted).  In evaluating "whether a plaintiff suffered a hostile work environment," a court "consider[s] the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive

utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 321 (citation omitted). "This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Id.*

Here, Plaintiff's allegations do not plausibly allege that "the workplace [was] permeated with discriminatory intimidation, ridicule, and insult." *Littlejohn*, 795 F.3d at 320-321. Indeed, the events alleged — considered individually or in tandem — are not sufficiently continuous, severe, or disruptive to show that Defendants subjected Plaintiff to a hostile work environment. *Id.*

As an initial matter, the only allegations in the TAC that arguably support discriminatory motive are those that the Court has already found insufficient in the context of Plaintiff's race discrimination claim. *See, e.g.*, *Hicks* v. *Rubin*, 6 F. App'x 70, 73 (2d Cir. 2001) (summary order) (affirming dismissal of hostile work environment claim for "same reason" as disparate treatment claim where plaintiff failed to establish that supervisors' conduct toward plaintiff "was motivated by race"). But even assuming Plaintiff had sufficiently alleged a discriminatory motive, her hostile work environment claim fails because the wrongdoing she alleges was "not sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment[.]" *Feingold* v. *New York*, 366 F.3d 138, 149 (2d Cir. 2004) (quoting *Alfano* v. *Costello*, 294 F.3d 365, 373 (2d Cir. 2002)). For

instance, Plaintiff claims that Aaronson's reassignment of Karen Cohen to a cubicle adjacent to Plaintiff's was "very unsettling" (TAC ¶ 46); but Plaintiff does little to explain what made this arrangement so troubling, and this allegation is thus a far cry from the requisite degree of harassment necessary to sustain a hostile work environment claim. At most, the TAC alleges only that Cohen "observed" Plaintiff for some portion of each work day during the six-month period they had neighboring cubicles. (*Id.* at ¶ 45).

Plaintiff also contends that her lack of evaluations for certain years and Rivera's "increased scrutiny" and "unmerited below average evaluation" contributed to a hostile work environment (TAC ¶¶ 105-06), but even "excessive criticism is generally insufficient to support a claim of a pervasive or severe hostile work environment," *Plahutnik* v. *Daikin Am., Inc.*, 912 F. Supp. 2d 96, 106 (S.D.N.Y. 2012) (citing *Fleming* v. *MaxMara USA, Inc.*, 371 F. App'x 115, 119 (2d Cir. 2010) (summary order)). Moreover, although Plaintiff alleges that "negative performance evaluations" could "adversely affect[ an] employee's prospects for career advancement" (TAC ¶ 81), she does not allege either that her below-average evaluation contributed to any adverse employment action, or that it was motivated by race or national origin.[17]

---

[17]    The Court has difficulty conceiving of a situation in which the lack of performance evaluations could support a claim for hostile work environment, as distinguished from disparate treatment based on a protected characteristic. Research has not disclosed cases in which the issue is addressed. Assuming that absence of criticism could suffice to support a hostile work environment claim, the Court still finds the allegations in the TAC to be insufficient under Second Circuit law.

Finally, even assuming Kim's single reference to another employee as a "Black guy" bespoke racial animus, the TAC suggests that Plaintiff only knew of this information secondhand (*see* TAC ¶ 78 ("Kim was known to have told [a coworker] … that there was a 'Black guy[.]'")), and this comment was not directed at her, *cf. Leibovitz* v. *N.Y.C. Trans. Auth.*, 252 F.3d 179, 189-90 (2d Cir. 2001) (holding that female employee failed to establish hostile work environment based on alleged sexual harassment of coworkers, where she was not target of harassment, present when it occurred, or aware of it as it was ongoing).  And even if this comment had been directed at Plaintiff, "[a] single incident of discriminatory comments is not sufficient to establish a hostile work environment." *Adeniji* v. *Admin. for Children Servs., NYC*, 43 F. Supp. 2d 407, 422 (S.D.N.Y.) (collecting cases), *aff'd sub nom. Adeniji* v. *Admin. for Children's Servs.*, 201 F.3d 430 (2d Cir. 1999).

Alone, each of these events does not amount to a hostile work environment.  Considered together, they are at most "isolated and sporadic incidents, [which are] generally insufficient to establish a hostile work environment claim." *Plahutnik*, 912 F. Supp. 2d at 106.  Plaintiff thus fails to state a valid hostile work environment claim.[18]

---

[18]     As noted, because Plaintiff fails to state a claim under §§ 1981 and 1983 against the Individual Defendants, any claim against the City under *Monell* v. *Department of Social Services*, 436 U.S. 658 (1978), also fails.  *See Segal* v. *City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) ("Because the district court properly found no underlying constitutional violation [supporting a § 1983 claim], its decision not to address the municipal defendants' liability under *Monell* was entirely correct.");  *see also Jones* v. *Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012) ("[A] municipality can be held liable under [§] 1983 *[only] if the deprivation of the plaintiff's rights under federal law* is caused by a governmental custom, policy, or usage of the municipality." (emphasis added)).  Additionally, Plaintiff has failed to demonstrate that the conduct of which she

### 3. Plaintiff's Pendent Claims Are Dismissed

#### a. Plaintiff Has Abandoned Her Claim Under New York Civil Service Law § 75-b

In opposing the motion to dismiss, under a section titled, "Defendants' Motions Should be Denied Except for Motion Based on CSL, 75-b," Plaintiff states, "Other than the argument relating to Civil Service Law[ §] 75-b, Defendants fail to show that they are entitled to judgment as a matter of law on any of the claims asserted by the Plaintiff in this action." (Pl. Opp. 9 (capitalization modified)). Plaintiff provides no further discussion of this claim, and no opposition to the arguments Defendants raise in seeking its dismissal. (*See* Def. Br. 22-23). Plaintiff has thereby abandoned this claim. *See Jackson* v. *Fed. Exp.*, 766 F.3d 189, 198 (2d Cir. 2014) ("[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned."); *Simon* v. *City of New York*, No. 14 Civ. 8391 (JMF), 2015 WL 4092389, at *2 (S.D.N.Y. July 6, 2015) ("[W]hether or not Defendants' arguments had merit, it was Plaintiff's obligation to address the issue, on pain of their claim being deemed abandoned." (collecting cases)); *Lipton* v. *Cty. of Orange, N.Y.*, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004) ("This Court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed." (collecting cases)).

---

complains was the product of a municipal policy or custom, or that any of the Individual Defendants acted with the requisite intent. *See generally Patterson* v. *Cty. of Oneida, N.Y.*, 375 F.3d 206, 224-26 (2d Cir. 2004).

Plaintiff's claim under New York Civil Service Law § 75-b is therefore dismissed with prejudice.  *See Allen* v. *N.Y.C. Hous. Auth.*, No. 10 Civ. 168 (CM) (DF), 2012 WL 4794590, at *4-5 (S.D.N.Y. Sept. 11, 2012) (dismissing abandoned claims with prejudice and collecting supporting cases); *Marks* v. *Nat'l Commc'ns Ass'n, Inc.*, 72 F. Supp. 2d 322, 328 n.6 (S.D.N.Y. 1999) (same).

### b.  The Court Declines Supplemental Jurisdiction over Plaintiff's NYCHRL Claims

Because the Court has dismissed Plaintiff's federal claims, only Plaintiff's NYCHRL claims remain.  The Court must therefore decide whether it will exercise supplemental jurisdiction over these claims.  *See* 28 U.S.C. § 1367(c)(3).  Finding that the relevant factors weigh against doing so, the Court dismisses Plaintiff's remaining NYCHRL claims without prejudice.[19]

"Once a district court's discretion is triggered under [28 U.S.C.] § 1367(c)(3), it balances the traditional 'values of [i] judicial economy, [ii] convenience, [iii] fairness, and [iv] comity,' in deciding whether to exercise jurisdiction."  *Kolari* v. *N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie-Mellon Univ.* v. *Cohill*, 484 U.S. 343, 350 (1988)); *accord United Mine Workers of Am.* v. *Gibbs*, 383 U.S. 715, 726-27 (1966). Generally, these four factors weigh in favor of dismissal after dismissing all federal claims at the pleading stage.  *See Cohill*, 484 U.S. at 350 n.7 ("[I]n the

---

[19]    The Court recognizes that Plaintiff's failure to address Defendants' election of remedies argument might also be seen as an abandonment of the claims.  *See generally Jackson* v. *Fed. Exp.*, 766 F.3d 189, 194-95 (2d Cir. 2014) (discussing abandonment); N.Y.C. Admin. Code § 8-502(a) (NYCHRL election of remedies provision).  That said, the Court believes the election of remedies analysis — including in particular the review of the relevant SDHR filings — is better undertaken at the state court level.

usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine ... will point toward declining to exercise jurisdiction over the remaining state-law claims."). And where, as here, all federal claims have been eliminated, Courts generally decline to exercise supplemental jurisdiction over NYCHRL claims. *See Garcia* v. *Barclays Capital, Inc.*, 281 F. Supp. 3d 365, 388-89 (S.D.N.Y. 2017); *Harris* v. *NYU Langone Med. Ctr.*, No. 12 Civ. 454 (RA), 2014 WL 941821, at *1-2 (S.D.N.Y. Mar. 11, 2014); *Mabry* v. *Neighborhood Def. Serv.*, 769 F. Supp. 2d 381, 402 (S.D.N.Y. 2011).

*First*, judicial economy favors dismissal given that, despite the lengthy procedural history of the case, the matter still has not progressed past the pleading stage. *See Chenensky* v. *N.Y. Life Ins. Co.*, 942 F. Supp. 2d 388, 392 (S.D.N.Y. 2013); *cf. Winter* v. *Northrup*, 334 F. App'x 344, 345-46 (2d Cir. 2009) (summary order). *Second*, given that the parties have expended no time or resources beyond disputing the viability of the pleadings, "the Court can see nothing inconvenient about requiring the parties to litigate their dispute in New York state court." *Cromwell-Gibbs* v. *Staybridge Suite Times Square*, No. 16 Civ. 5169 (KPF), 2017 WL 2684063, at *8 (S.D.N.Y. June 20, 2017). *Third*, neither party would be prejudiced by continuing this litigation in state court should Plaintiff timely refile. *Fourth* and finally, the Court finds, as other courts have found in similar circumstances, that comity weighs in favor of declining to exercise supplemental jurisdiction over Plaintiff's remaining claims under the NYCHRL, given that statute's expansive standard for liability in

comparison to its federal counterparts. *See id.* ("Plaintiff seeks relief under the NYSHRL and the NYCHRL, both of which protect the rights of New York workers, and both of which provide for more expansive liability than Title VII."); *Emmanuel* v. *Cushman & Wakefield, Inc.*, No. 13 Civ. 2894 (GHW), 2015 WL 5036970, at *9-10 (S.D.N.Y. Aug. 26, 2015) (declining supplemental jurisdiction over plaintiff's NYCHRL claim after dismissing Title VII claims, in part because of "the NYCHRL's uniquely broad and remedial purposes," and noting that "courts in this District frequently decline to exercise supplemental jurisdiction over NYCHRL claims" (alterations and citation omitted)).

The Second Circuit has made clear that where, as here, a "[p]laintiff['s] federal-law claims [have been] eliminated on a motion to dismiss, prior to the investment of significant judicial resources, and [the court] can discern no extraordinary inconvenience or inequity occasioned by permitting the claims to be refiled in state court," the court should decline to extend supplemental jurisdiction over the remaining state-law claims. *Kolari*, 455 F.3d at 123-24 (quoting *Gibbs*, 383 U.S. at 726). Mindful of this admonition, the Court dismisses Plaintiff's NYCHRL claims without prejudice.

## CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss is GRANTED. Plaintiff's claims under the New York Civil Service Law § 75-b, Title VII, and 42 U.S.C. §§ 1981 and 1983 are dismissed WITH PREJUDICE. Plaintiff's claims under the NYCHRL are dismissed WITHOUT PREJUDICE.

The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

     SO ORDERED.

Dated:     August 3, 2018
             New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge